Next case is number 24-2977, In Re Viatris Inc Securities Litigation. Mr. Messerschmidt. May it please the Court, Jan Messerschmidt for appellant. With the Court's permission, I'd like to reserve two minutes for rebuttal.  This Court has reaffirmed again and again that materiality is a fact-specific question. What matters is what is important to a reasonable investor based on the total mix of information. Sometimes the answer to that question is so obvious that it can be decided at the pleading stage, but this is not one of those cases. Viatris repeatedly told investors that it was committed to buy assemblers as its core growth driver when it was instead deciding whether it was non-core. Investors only learned the truth when Viatris sold the entire business. How do we know when the company decided it was non-core? Well, Your Honor, I think we know based on the... We're asking for a date. How do we know when? On what date did we learn that it was non-core? Your Honor, I can't give you a precise date, but I think it's a reasonable inference that by October of 2021, they had decided it was non-core or at least thought it was that they would likely determine it to be non-core. What was the basis for you saying by October 2021? What facts? Yeah, the basis is the confidentiality agreement that was between Viatris and Viacom, which facilitated the negotiations for selling the buy assemblers business. Isn't that an early stage in even being able to take a look at what the financials are, what the success rate is with the product line? Your Honor, I think what makes these statements important to investors is not so much the sale, but the fact that by determining that Viatris was non-core, it was a fundamental shift in strategy. Investors would want to know that the strategy that the company was consistently touting to the public and telling investors was foundational, which is that Viatris was going to be its core growth driver for long-term growth. It matters to investors the fact that the company is internally doesn't have confidence in or commitment to that strategy. So that the key... What about the case law saying that an NDA is not enough to raise an inference that such a decision has been made? Well, Your Honor, I disagree that the case law says that. In that brief defendant's site, the Millbridge case from this circuit as well as the Kirkland case. But in those two cases, at the motion to dismiss stage, they found that it was enough. And again, what matters is what is important to a regional investor in light of the total mix of information. Right. That is what the materiality question is determined by. Yeah. Viatris, I believe. Well, Your Honor, if I understand your question correctly, I think we know that from... I mean, we know that they were considering whether Viatris was non-core as definitely as early as March 1st because defendants' sub-date. Sorry? That's right. That's right. But... Well, Your Honor, again, what the fact shows is the defendants' statements themselves from February 2022 when they announced the Viacom sale and they explained what the strategic review was and the goals and aims and timing of it. Well, yes, Your Honor, because of what they said was that a strategic review was throughout 2021. And in addition to that... Well, again, Your Honor... No, Your Honor. Our claims are not based on the consideration of the divestiture. Our claims are on the consideration of the business as non-core.  Right. But I think it is different, right, because the divestiture is the result of the determination by some of the businesses. It was non-core. Well, because in February 2022, they explained when the strategic review was, which is throughout 2021. And then in addition to that, we have the specific comments that are referring to strategic planning as early as you said, Your Honor, on March 1st. And we... How can I deduce from that? Yes, Your Honor, but they would know the scope that included the fact that they were going to... Because they explained that the scope and purpose of the strategic review was to determine whether each and every part of the business was core or non-core. And so on March 1st, they would have known that they had not decided to commit to buy similar, that they had not determined that it was core to their future business. They knew that they were going to determine later whether it was core or non-core. Is it possible that that can change, that from month to month or from year to year something can be core and non-core? Or is it your foundation of your argument that it's a binary and that from the minute the merger of Milan and Upjohn created Viatris, that there was core and non-core and that couldn't change over time? Your Honor, of course, that it could change. But the statements that the defendants were making to the market was that it would not change. They told them that repeatedly on March 1st that Viatris was committed to buy similars. They told them that it was a core part of their future business. And when they were asked by an analyst, the second question from an analyst on March 1st was, the analyst noted that a competitor had signaled its exit from the buy similar strategy. And the analyst asked, what could Viatris do in terms of changing its game plan? And Mr. Gellar and Mr. Mulvey flatly denied that it would. While we're staying in. Yes. We're staying in. All right. That's March. And then August 9th, earnings call. They say, we're pleased to report that our global buy similar portfolio grew by 40% this quarter. It's pretty good, right? It's, in fact, a lot better than the other. Our overall complex generics and buy similars category declined by 8% year over year. So can't two things be true? Can it be true that they were really humming on all cylinders, doing quite well with the global buy similar portfolio as of August? And then, you know, a few months later in October, maybe someone made them an offer that looked quite good. So I just don't, I don't understand why there's sort of inherent conflict here. That's what I'm struggling with. The conflict is between the statements and what was actually going on. The statements were conveying that the interest was committed and had decided to commit to buy similars for the long term. And that's exactly the way the market. And that can't ever change. Well, it could change, Your Honor, but they had indicated, they conveyed that it wouldn't. And so. Well, that's a classic forward-looking statement. That's a prediction about the future. They can't be held liable for that. No, Your Honor, it's a present tense expression because they said that they were committed. And so that conveyed that the company actually had decided at present time to commit to buy similars. That means ad infinitum? When they say on a certain date we are committed to this, that means that they have to be committed as long as the company exists? Well, Your Honor, what made those statements false was that they were false at the time. The company had not committed to buy similars. So certainly it could change. Well, what's the definition of being committed to? I don't know what that means. I mean, I'll tell you what I understand it to mean, and then you can, you know, help me and tell me why I misunderstand it. When they said we're committed to buy similars, go back to the comment you made. I think of that as the double-down comment, right? They're sort of given an off-ramp by the analyst. They're like, oh, no, no, we're staying in biosimilars, right? That to me shows commitment, right, that they're going to pursue biosimilars. But that doesn't mean a month, three months, six months, a year later that they decide, well, this is a really good opportunity, let's sell it. So I'm struggling with why those two things are inherently contradictory or misleading or a misstatement. Well, what is contradictory, Your Honor, is that when they were telling investors that they were committed and were flatly denying that could change, they knew they were deciding at that time whether the business was non-core. And so that showed that they had not committed to biosimilars, that they had not decided. And they didn't admit that. Well, because, Your Honor, the comments about strategic planning would not indicate to investors anything about the commitment to biosimilars, right? When it says it says bottom-up, I mean, part of the reasons you said what they failed to disclose is that it was a thorough strategic review. And when they say we're making good progress on rigorous bottom-up planning, that's pretty thorough. No, Your Honor, that's not what our claim is about. Our claim is not whether or not they were conducting a thorough review. Well, Your Honor, what we say is that what they misled the market about was that it was a thorough strategic review to determine whether biosimilars was core or non-core. That is the key fact. It's not just that they were conducting a strategic review. It's the scope of that review and that it showed that they had not committed to the strategy. Well, I don't think there's anything about the term bottom-up that conveys that it necessarily means they're reevaluating the entire strategy that they're conveying to the market. Well, Your Honor, I see my time is up. You can keep in mind that they have what admittedly look like boilerplate disclosures, but in all their 10-Ks and 10-Qs, they're saying everything is on the table for potential divestitures. I see my time is up. No, no, go right ahead. Well, to answer Judge Fink's question, I think the first step would not be to make the explicit statements that they had committed to biosimilars. To correct that, I think that they would have to make a statement that negated the misleading effect of that statement. And so that would require at a minimum something that communicated that they had not committed to biosimilars. I had to specifically talk about biosimilars, not just like a thorough word. Yes, Your Honor, because, you know, as this Court has recognized in cases like GSE Partners and others, to correct a misrepresentation, it has to be a specific corrective disclosure. A generic disclosure cannot negate a specific one because it wouldn't indicate anything to an investor. All right. I'd like to delve into that because I think you accurately stated the legal proposition, but I'm not sure it maps onto the facts the way you would like. The way I see that mapping onto the facts would be this. If they had responded to an analyst question or otherwise made a disclosure that said, we are not going to divest our biosimilars business, and then in the 10-K and the 10-Q, they made a generic statement that any and all divestitures, you know, might happen. I think you've nailed it. You're a winner. But I don't see that here. I see facts that are talking generally about biosimilars being strong, biosimilars being of interest. They're committed to biosimilars. They're going to pursue it. Obviously, the numbers reflected that it was a good segment for the company, but I don't know how any of that is inconsistent with them choosing at some later point to sell the segment if they get a really sweet offer. What am I missing there? Your Honor, what I think you might be missing is the fact that at the time they made those statements, they had not committed to biosimilars. And so that's directly contradictory to what they're telling the market. So we keep coming back to what it means to be committed to biosimilars. Yes, Your Honor. How do we know what that – put some meat on those bones, define that? Well, Your Honor, I think we can look to the analyst commentary and how they understood it, right? If you look at their reaction, for example, to the announcement of the biosimilars sale, and these are paragraphs 130 to 135, the analysts were shocked by that because they understood that VHS had committed to that, right? They explained that they understood that VHS had consistently touted the biosimilars was going to be core to the long-term growth strategies. So the analyst commentary shows how they understood what those statements were made, and that's contradictory to the fact. We can't make the law based on how one or two or ten analysts respond, right? I mean, presumably a bunch of other analysts were reading the 10-Ks and 10-Qs saying, well, biosimilars may be good, but all divestitures are under consideration and might happen. And also another part of it that I wrestle with is that clearly you've got a diminution in the market. You've got, I think, a 24 percent drop. So that's pretty significant. But I wonder what would have happened if the company, after it was created, and they're posting good numbers here, like we've talked about, and then they just said, oh, by the way, we're considering all divestitures and biosimilars as the top of the list. Isn't it possible the market would have plummeted even more than 24 percent with a statement like that? Well, Your Honor, I think the question here is whether at the pleading stage we know that their statements, their misrepresentations are immaterial. So that's the question. It's not whether it was plausible that an analyst could have read things differently. It's whether at this stage we know that it was obvious that their statements about that misrepresented the commitment and misrepresented kind of the core strategy that it was telling investors are immaterial. To a reasonable investor. I don't think it's a question of immaterial. I'm struggling with whether there's even a misrepresentation.  Because there has to be an actual omission. So far you haven't pointed to anything up until October, the NDA, which is a weak inference. But up until October you haven't pointed to anything that I can see raises an inference that they weren't actively and seriously considering biosimilars as non-core. I mean, if you can't point to something, then that's not even a misrepresentation. Well, Your Honor, I mean, I'll start by saying that defendants do not contest that they knew that the process for determining core or non-core was known as early as March 1st. I mean, the premise of their whole argument is that their statements on March 1st fully disclosed the scope of that review to the market. And, of course, we disagree with that. Well, that's what they say. But the premise of their argument for why those are not misrepresentations is they say they fully disclosed that to the market, that the whole scope of the strategic review was disclosed as early as March 1st. So that concession itself shows that they knew at that time that they were going to be determining whether biosimilars was core or non-core. And the key fact here is it mattered to investors about whether or not the company was committed to biosimilars. The whole basis for the strategy that they were communicating to the market was, you know, biosimilars will offset the base business erosion in the rest of the business. The analysts were asking about it at every single conference call, every term of earnings call. It was being touted to the market as kind of the key pathway for growth. And so it would matter if the company was not confident and was not committed to its strategy. That would matter. But, again, what matters at this stage is whether their statements are immaterial as a matter of law. Let me get there if they're false or misleading. It seems a bit circular. You're positing that they knew at the time of making the statements, you know, back in as early as November of 2020 that the biosimilars were non-core. And the basis for inferring that that is false or misleading, you're telling us is that they entered into a confidentiality agreement in October of 2021 and that really the following year they then consummated that sale. And that was the culmination of this strategic review. And from that you would infer that from the outset of the strategic review they knew that it was non-core. And we know that because what's put out there as to it being the nature of the strategic review is that they're saying that they're going to review all aspects of the company. After all, they're a newly formed company, right? I guess I'm struggling with that seeming to be fairly circular in terms of why we would infer, you know, anything being false or misleading in these the first 12 statements, everything that precedes at least the confidentiality agreement. We are not saying that Beatrice and knew that biosimilars was non-core on March 1st. That's not the basis of our claim. What we are saying is that they knew that they were going to be deciding whether it was non-core or core. And that contradicted the statements that they were telling the market that they were committed to biosimilars. They had decided to be committed to biosimilars for the long term. That is a just – it's not consistent to be saying that you're committed to something while you're actually deciding whether you're not. And it matters to investors that they were committed because, you know, if a company – if the key drug driver that the company has is not something they're committed to, that raises risk, that raises uncertainty. Those are all things that are significant and important for investors. But as we – you answered in response to Judge Hardiman's questions, views can change. And you're asking us to impute the belief at the first statement being November 16th of 2020 that biosimilars was non-core. And I take it by that you mean it was something that was on the table and part of the strategic review. Well, Your Honor, we are not promising it on the fact that they knew that it was going to be non-core. The premise here is that when they said at the time they were telling the market that they were committed to biosimilars, they knew that they were deciding that it was non-core – whether it was non-core. That contradicts the explicit repeated statements that the company was committed to. It's false at the time. Well, we should have been saying it's under review, all things are on the table. Instead, they were doubling down, insisting that it's core. Yes, Your Honor. Or critical or whatever. That's one thing they could have done. They would have to say everything's on the table if they had to say biosimilars are on the table. No, Your Honor, because that would do nothing to correct the misleading effect of the misrepresentation. I'm just trying to get your position. They had to say not just everything's on the table. Right. And, you know, that's because if an investor, you know, reads a disclosure that says, you know, we may divest something, that's not inconsistent with saying that you are committed with something else, right? Investors would have understood from the disclosure and the statements that the defendants were making is that while, you know, Vietras might divest some other parts of the business, that the biosimilars was off the table. So there's nothing that would have communicated that ain't correct. We understand. We understand, and we'll hear you again on rebuttal. Thank you, Mr. Messerschmitt. Let's hear from Mr. Johnson. Thank you, Your Honor, and may it please the Court. There are several clear and independent paths to affirming here, among them the lack of a material omission, both prongs of the PSLRA safe harbor and scienter, to name a few, that cut across most of the statements. But you've just heard a lot from my friend, Mr. Messerschmitt, about two things. One is the inadequacy of the risk disclosures, and the other is the statements of commitments. And so I'd like to address those two things first, and then I'd like to turn to Judge Chung's question about the nondisclosure agreement, which you don't need to reach, if I convince you on the first points, but may be important to you. As to the risk disclosures, as the recent questioning indicated, the plaintiff's position is essentially that disclosing divestitures wasn't enough. It had to specifically disclose that biosimilars might be divested in order to, you know, which I'll turn to in a minute. But what I haven't heard much about from my friend, Mr. Messerschmitt, is the text that Congress put in prong one of the PSLRA. It said you need meaningful cautionary language about important factors that may cause things to change. They're essentially saying, no, no, you have to identify the specific risk, the very specific risk, very precisely, that actually materialized. But Congress said, no, it's enough to identify with meaningful cautionary language the factors. Now, these risk disclosures were actually quite specific. They go beyond what this Court has upheld in cases like GSC Partners and Avia. They said an important factor that could cause things to change is our ongoing look at divestitures. It said those divestitures could change the size and or the scope of our business. It said they could be material from both a strategic and a financial perspective. It said they could reduce opportunities for certain products and certain markets. Now, again, these are more specific than the things that you have upheld in prior cases. If you look at the GSC Partners case, that was a case about whether certain collections were probable. And the risk disclosure said settlement depends on individual circumstances and negotiations. In Aetna, where the issue was flagging the risk of underpriced premiums, the risk disclosure said the accuracy of medical costs cannot be assured. In Avia, where the issue was there could be inaccurate assumptions about price and product competition. The defendant missed the revenue target. And all that the risk disclosure did was to say that there could be inaccurate assumptions about price and product competition here. And this Court described those risk disclosures as extensive and specific. The ones here are far more extensive than that. They are very tailored. The only thing they don't include is what the plaintiff thinks is a magic word you need of biosimilars. But that's not what Congress required, and that's not what this Court's cases require. So as to Statement 11 and 18, all the other statements had expressed references to the risk disclosures. The ones on March 10th, which is 11, and then also 18, did not. But, of course, under this Court's cases like Ocugen, you still ask the question of whether there was a material omission. And you look to the information on the market as a whole. So you maybe don't analyze that, then, as a safe harbor situation, but those two statements are protected for other reasons. But to come back to March 1, which is where all the focus has been, I want to first talk about these statements of commitments. First of all, that's the only time that Beatrice used the word commitment in talking about biosimilars. This was fully a year before the Biocon deal is announced. In those statements, the company expressly referenced its SEC disclosures, expressly. And, in addition, it announced a comprehensive strategic review. And it said, look, this is going to look at every strategic lever at our disposal. It's going to involve a rigorous, bottom-up look at the whole company. The premise of Mr. Messerschmidt's argument is that there's some inherent inconsistency between saying, we're committed to this, it's been profitable for us, we think it's, and we're excited about the future of it, but we're also looking at the whole company. And remember the context here. This is in the wake of a corporate merger, when a reasonable investor would naturally expect you to be looking at things like that. And they very specifically said, not only could the divestitures involve any product line or area, and it could be strategic, but we're doing a whole comprehensive review of the company. It could transform the company. The company said things like this repeatedly. So you don't even get to first base on falsity, let alone materiality. He is characterizing this as a case about materiality. That's down the road, as Judge Krause's questions acknowledge. Why did the company use the phrase strategic planning instead of strategic review? I don't know, Your Honor. I don't think there's a material difference between that, especially when you look at the statements as a whole. When you look at words like a rigorous. It isn't there. I mean, strategic planning sounds more fuzzy, that it's what every company does all the time. But strategic review, I think, bespeaks a more hard look at business sectors. So I don't concede that, but I think I could concede that, Your Honor, because of everything else that was said. When you say we're doing a rigorous, bottom-up review of every strategic lever at our disposal, and this could transform the company, you can call that strategic planning. You can call it strategic review. There's no question it was comprehensive. And you're not taking the position that, at some point, biosimilars were core and critical and important, but that changed? There's just no allegation that these statements weren't believed at the time that they were made or some facts that suggest this. The whole idea that he is promoting is that there's an inherent inconsistency between saying, we're committed to this, it's been profitable, we think it's good, but we're taking a look at everything. And, by the way, opportunities come along. If I own, say, a flooring store, and I sell carpet, and I sell tile, and I sell hardwood, and you ask me, well, are you committed to your carpet line of business? And I say, yes, I am. It's actually been quite profitable, and we think it's doing well. We think it's a key part of the company's future. But, by the way, we're doing a whole comprehensive look at the company, and at times, offers come along, and we assess whether it's better to spin off a product line in order to get the resources. I don't think you can reasonably say in a year, if you come back, that you're surprised that I sold the carpet line of business and I'm just selling hardwood and tile. That's what you have here, and you have this repeatedly. Well, you have a little more here. You've got analysts saying, you know, I look at your tile, I look at your flooring, and I look at your carpet, and carpet is a challenge, and a lot of companies are getting out of the carpet business. Are you going to get out of the carpet business? And the answer is, oh, no, not only are we not getting out, we're fully committed to it. But those weren't guarantees, Your Honor. They weren't promises, in the words of the district court, to maintain that policy. If they're not promises and they're not even statements of fact, what are they? They're forward-looking statements? I think Congress ‑‑ Or three, what are they? I think they're classic forward-looking statements, as you put it earlier. Look at the definition of forward-looking statements that Congress provided. Plans and objectives about the future of things like products. This falls squarely within it. Now, my friend suggests that because there's some element of present intention in that, and, you know, that that disqualifies it. I don't think that's the case. Under this court's decision in Avaya, if there's, you know, every forward-looking statement, of course, at some point has, in some respect, has a present component. You know, if I say, you know, after the argument, I expect I'll go to lunch, I mean, that reflects my present intention. But it's not less a forward-looking statement. And Avaya says that if it's sort of the present part is sort of necessarily implicit in the future part, it doesn't take you outside the meaning of forward-looking statement. And this is classic. These are separately discernible references. And the response to the inquiry was this is an area we have decided to hang in, not get out. That decision that is being represented in the context of other things that are under review, why isn't it a fair inference there that that would mislead investors? Well, two things, Your Honor. First of all, I think it's we've decided to hang in. They're saying the decision is about the long term. It is forward-looking. It's still statements about the plans and objectives of the company. In addition, there's no evidence that those statements weren't believed at the time. There's nothing to support that idea. Should a reasonable investor understand the statement Judge Krauss just raised and understand that to mean you've decided today to hang in, but that could change tomorrow or next week? Is that your position, that that's how reasonable investors should look at that? Well, I do think you have to ask the question of is it a guarantee? Is it a promise? Because things do change, and companies need to be able to adapt. It's one thing if they make a specific express guarantee. This does not rise to the level of that. Is it false to say we've decided to hang in if there was no vote of the board or the executives? It's just sort of a general statement? I don't think it's false at all. Who's we? We've decided to hang in. This is management speaking, I guess, saying that. These were obviously the CEO and president of the company, so nobody's contending that the speakers were not senior leaders of the company. But to your point about board consideration, that actually is a good transition to Judge Chung's question about the nondisclosure agreement. You've got this whole period starting on March 1. That's when all the statements of commitments were. That's sort of fully a year before the Biocon deal is finalized, and there's just nothing to indicate that there was any consideration of divestiture until October 26. What do you have then? You have a nondisclosure agreement. What does the case law say about that? The cases are uniform about this. That is not enough to establish active and serious consideration of a deal. It simply opens the door to explore it. I would urge the court to be careful about this because you can put defendants in a very precarious position if you create a burden to disclose too early. The last statement here, and only four of them post-date the nondisclosure agreement, the last statement is December 1, 2021. That is fully three months before the Biocon deal is finalized. That is an eternity. Even if we say it's not. So there's a lot there, Your Honor, and I'll try to break it down. First of all, it's undisputed that the strategic review is still going on. on December, at the end of November, at least through November.  And, and, and. They were done. Well, they didn't say they were done. And they, bear in mind that on September 10th, Mr. Gettler said, we're going to take a very deep look at biosimilars. And so you know that as of September 10th. Well, I think you have to be a little more careful with the timing here when you're dealing with things like the disclosure of a divestiture. But just to finish the thought about September 10, I think you can take two things away from that. First of all, at that point, the strategic review had not yet reached biosimilars. That was still in the future. So let alone had it be done, let alone had anything decided. So the only thing you have after November, really, is the December 1 statement. And there is no evidence that, you know, under prong two of the safe harbor, that Mr. Gettler actually believed that was false. There's nothing. Now you point to the article. There's several problems with the article. First of all, it's 10 days after the last statement. Second of all, it's anonymously sourced. Third of all, there's none of the who, what, where, when, and how of the fraud that their own cases and brief acknowledges you have to have. Well, you know, the PSLRA, let alone Scienter, the components of the PSLRA, are very demanding. I mean, you have to have particularized. No, I understand. But I'm just saying that's another path to affirmance if you choose to reach it. It's a question of law. It's been fully briefed. But, I mean, the prong two of the safe harbor says you have to have actual knowledge of falsity. So in this context where you're dealing with fraud, you have to have particularized allegations that something is false. And here, all you have is an NDA. There is nothing to show that these negotiations were advanced, nothing to show that they reached senior levels of the company, nothing alleging that the people making these statements or the board, you really need to have some sort of serious consideration for it even to get to that point. Now, analytically, I want to be clear, you don't have to ask whether there's active and serious consideration if you conclude that the commitment statements, you know, on March 1, weren't a guarantee or some sort of promise to stick with biosimilars, despite all the disclosures made about vestiture and the comprehensiveness of the strategic review. But if you do get to that, then I would suggest that, you know, the cases are uniform. And he suggested they're not all motion to dismiss cases. But the principle is the same. The legal principle is what we're invoking. An NDA is not enough. It just opens the door for exploring something. And they don't have any particularized allegations. So, sure, measure it against the complaint. It's not an issue of affidavits and declarations, but they can't get past that.  A hundred percent, Your Honor. There's been no suggestion that the individual defendants, I think, weren't available that there's anything other than a derivative. But let me take Vietras, okay? So the short answer is that the bar on invoking the safe harbor applies to the issuer. That's Vietras. And Vietras is a successor to Upjohn, not to Milan MV. It was Upjohn that changed its name to become Vietras. None of this was pled. The theory wasn't pled, let alone the allegations supporting the theory. So I think if you want to ask why the district court didn't reach it, there was nothing to reach. But even if it were properly before you, it's just there's no way it can satisfy Delaware law. You've got 57 percent of the shareholders, and this is at page 284 of the joint appendix, are Upjohn shareholders, former Upjohn shareholders. They're new shareholders of this company. So it's not – Milan MV is not – Vietras is not Milan MV's successor. It's Upjohn's successor. All right. Thank you, Mr. Johnson. Let's hear rebuttal from Mr. Messerschmidt. Mr. Messerschmidt, can I ask you just a, I think, straightforward question? I don't know. Your Honor, we're not appealing the statements that were not listed. I do have a couple of points. The premise of the argument my friends are advancing is that no reasonable investor would have been misled because of the other disclosure. But we know that they were. We have the facts that the analysts were reacting to the announcement with shock. I don't know if they were reasonable. We know people reacted, but we don't – it doesn't make them reasonable. Yes, Your Honor, but that's precisely the fact why this is a fact-specific inquiry, right? It can't be resolved. We don't know at this stage. I can't rule it out. For dismissal to be warranted on material grounds at the motion dismiss stage, the court has to – Let me ask you this basic question. Would it be reasonable for an investor to be unfamiliar with a company's 10-Ks and 10-Qs that they invested in? Well, Your Honor, I don't think that that's relevant to the question. The question is whether a reasonable investor would have understood the disclosure to – I understand that's your answer about this case. I'm asking you a general question. Shouldn't courts hold reasonable investing at least to the standard of being generally familiar with 10-Ks and 10-Qs? No, Your Honor, I don't think that there's any standard that the reasonable investor has to read all the SEC files. The standard is the company has to tell the truth. So that's interesting because that just seems to invert things for me. It seems like you're putting tremendous weight on analyst calls while diminishing the significance of SEC-required filings, and it seems to me that's an inversion. The filings that the SEC requires public companies to put together and file, they're done with great care. If they say one word or one sentence out of line, they're going to get sued in a class action. Why shouldn't courts give great significance to those public filings and some significance but perhaps less significance to analyst calls? Well, I think that there's a difference between a generic disclosure of possible divestitures, which is all this statement was, and repeated specific unequivocal statements. I think you're pivoting to the facts of this case. Yeah. You're not answering my general question, but that's okay. I think we understand your point about the facts of this case. You're saying that the general can't control the specific. And when somebody makes commentary, when corporate executives make commentary of a specific nature, those things can't be vitiated through generic, more general comments in public filings. Yes, Your Honor. I think there would be profound consequences if you were to hold that a general statement can control a specific, right? Because in that scenario, then a disclosure regime means heads, I win, tails, we lose, right? Because an investor has no idea which one is true. And that's very consequential. It would mean that investors could not even rely on concrete specific statements because it might be contradicted by a general one. I mean, that would be destabilizing for the market. So I think that's something that we shouldn't have. I understood what you were saying earlier to make the general statements, those disclosures as to the strategic review sort of part and parcel of why it's false and misleading. That by, on the one hand, saying we have decided to hang in and not get out and we're conducting a strategic review, that aligning those two things would communicate to someone, we've made a decision to keep this product line out of the strategic review. That's right? That's part of your argument? Yes, Your Honor. I mean, saying that you have decided to commit to and decided for a long-term commitment to buy similars is false because they had not decided that. We know that they haven't. And that communicated something that was material to investors. Thank you very much. Appreciate the briefing and argument. The court will take the matter under its own.